2017 IL App (1st) 163171

No. 1-16-3171

Third Division
May 31, 2017

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| IN RE THE CUSTODY OF G.L. | ) | Appeal from the |
| | ) | Circuit Court of |
| (Matthew L., | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 13-D-79172 |
| | ) | |
| v. | ) | Honorable |
| | ) | Mary C. Marubio, |
| Sarah Finn f/k/a Sarah Czerwinski, | ) | Judge, presiding. |
| | ) | |
| Respondent-Appellant). | ) | |

JUSTICE COBBS delivered the judgment of the court, with opinion.
Justices Lavin and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1      Respondent Sarah Finn, formerly Sarah Czerwinski, appeals from the trial court's order granting respondent Matthew L. the majority of parental decision making responsibilities and parenting time in regards to their minor child, G.L. She contends that the Cook County circuit court failed to consider all statutory factors in determining the best interests of G.L. and improperly considered testimony regarding school quality. She also argues that the trial court's findings were against the manifest weight of the evidence and that the court

erroneously restricted her parenting time to locations within a one-hour drive of Matthew's home. We affirm in part, vacate in part, and remand for further proceedings.

¶ 2                                I. BACKGROUND

¶ 3        Sarah and Matthew met in 2009 and began living together. Their son, G.L., was born on September 4, 2010. The three lived together on the north side of Chicago until December 2012, when Sarah left the joint residence and brought G.L. to live in her grandparents' house in Oak Lawn, Illinois. On February 1, 2013, Matthew filed a petition to determine the existence of a parent and child relationship seeking, *inter alia*, to allocate the parental responsibilities regarding G.L. Steven Wasko was appointed guardian *ad litem* for G.L. on April 9, 2013.

¶ 4        In April 2013, Sarah and G.L. moved into her boyfriend Travis Finn's apartment in Sidney, Illinois, in Champaign County. On May 24, 2013, Matthew filed an emergency petition for temporary possession of the child, which protested Sarah's relocation to Champaign County. In the petition, Matthew alleged that he had maintained "consistent and extensive parenting time" with G.L. since the separation but on May 21, 2013, Sarah had informed him that he would need to travel to Kankakee, Illinois, if he wished to have time with G.L. He also alleged that he and Sarah had previously agreed to place G.L. in a Chicago-area daycare center. However, Sarah had recently and unilaterally stopped bringing G.L. to the daycare center. On May 29, 2013, the trial court entered a written order finding that an emergency existed and ordering the parents to "maintain the status quo" regarding G.L.'s daycare.

¶ 5        On June 24, 2013, a hearing was scheduled to take place on the petition, but a judge was not available. Instead, Matthew and Sarah negotiated an agreed order for temporary custody

of G.L. The parties agreed that Matthew would care for G.L. for three weekends and one full week each month and Sarah would care for G.L. for the remainder of the month.

¶ 6    In August 2015, Sarah and G.L. moved into a hotel for two weeks after Travis Finn, whom Sarah had married in June 2013, obtained an order of protection against her. Matthew filed an emergency petition for temporary custody of G.L. on August 21, 2015. On September 2, 2015, the trial court found that an emergency no longer existed because Sarah and G.L. had returned to their residence with Finn. Finn subsequently filed for divorce, and Sarah moved with G.L. to nearby Philo, Illinois.

¶ 7    On August 3, 2016, the trial court gave the parties leave to amend their pleadings to comply with the Illinois Parentage Act of 2015 (Act) (750 ILCS 46/101 et seq. (West Supp. 2015)), which had become effective on January 1, 2016. Matthew subsequently filed a petition for allocation of parental responsibilities seeking all parental responsibilities and decision making authority, the majority of parenting time, and the relocation of Sarah and G.L. to Cook County.

¶ 8    Sarah filed a counterpetition on August 11, 2016. Sarah sought the majority of parenting time and to have her residence declared G.L.'s primary residence to allow his enrollment in the Champaign County public school system. She subsequently enrolled G.L. in kindergarten in Philo in September 2016.

¶ 9    The trial court held an evidentiary hearing in October 2016. At the hearing, Sarah testified that G.L. was born in 2010. She, Matthew, and G.L. lived together on the north side of Chicago until the end of 2012. During that period, she took care of G.L. "the majority of time," and Matthew took care of him "very little." In December 2012, Sarah moved with G.L. into her grandparents' empty house in Oak Lawn. She testified that she moved because

she did not "feel it was safe" after Matthew had angrily chased her out of the shower and "tr[ied] to rape" her. She lived in Oak Lawn with G.L. until April 2013 when she decided to move down to Champaign County to enroll in a cheaper nursing school, which she attended for one semester. She informed Matthew of her decision, and he became "aggressive." She first heard of the custody proceedings in May, when Matthew filed the emergency order regarding her move. After moving in with her then-boyfriend Finn in Champaign County, Sarah enrolled G.L. in preschool and regularly kept Matthew informed of events in G.L.'s life. She described her employment with a State Farm insurance agent but explained that she works for the agent, not the corporation itself, and thus she could not easily transfer to the Chicago area. Her current home with G.L. is a two-bedroom, single-family home with large yards and a playground nearby. G.L. has many neighborhood friends, as well as school friends. He is involved in sports and loves his school. Sarah admitted that she had never filed a petition to relocate. She additionally testified that there were periods where she failed to cooperate with court-appointed evaluators, but they were due to an inability to pay and not due to unwillingness.

¶ 10    Matthew testified that after G.L.'s birth, he and Sarah divided the child's care roughly equally. Although Matthew was working two jobs at the time, he would bathe, change, and feed G.L. when he got home at night. Around the time of G.L.'s first birthday, Matthew was laid off from work and took care of G.L. the majority of the time because Sarah was in school. When Sarah started school, they both agreed on a local daycare center for G.L. The couple separated in late 2012 because Sarah began seeing Finn. Matthew attempted to talk with Sarah several times about how to divide parental responsibilities, but she never responded. Sarah eventually moved to Oak Lawn with G.L., but Matthew continued to care

for G.L. 60 to 70% of the time. In March or April 2013, Sarah told Matthew that she was planning to move to central Illinois, and Matthew responded that was unacceptable. He became aware that she had moved at the end of May 2013 when she texted him that he would have to drive to Kankakee if he wanted his time with G.L. Matthew takes care of G.L. during his parenting time and takes him to museums and parks around Chicago. Sarah refused to tell Matthew where she and G.L. were living both when she moved into the hotel and later when she moved from Finn's home following her divorce. She did not inform or consult him regarding matters of G.L.'s education and extracurricular activities, including his preschool graduation. She scheduled ear surgery for G.L. without consulting Matthew. Several times when Matthew dropped off G.L. with Sarah, G.L. threw "temper tantrums" and refused to leave him. Matthew further testified describing his two-bedroom home in Wilmette.[1] He noted that the schools in the area are highly rated and were ready to accept G.L. as a student depending on the court's order. Matthew denied Sarah's allegation that he attempted to sexually assault her.

¶ 11        Phyllis Gould, a licensed clinical social worker appointed by the court as an independent child-custody evaluator, testified that she had created an independent child-custody report and later supplemented that report. Both the original report and the supplemental report were entered into evidence, although they are not a part of the record on appeal. Gould indicated that she had diagnosed Sarah with borderline personality disorder and commented on Sarah's "extreme displays of anger." She also noted she had diagnosed Matthew with persistent depressive disorder and he also had difficulty controlling his anger. She described concerns involving both of the parents' prior use of drugs and alcohol but noted that there was "no concrete evidence of either one abusing drugs or alcohol at the moment." Gould testified that

_____

[1]Photographs of Matthew's home were entered into evidence but are not contained in the record on appeal.

G.L. had separation-anxiety disorder and struggled with leaving either parent. His condition was further exacerbated by the multiple moves he had made as a child. She opined that the three-hour drive between Matthew's home in Wilmette, Illinois, and Sarah's home in Philo was not good for him and "it's just not workable." Gould evaluated the school districts in Wilmette and Philo and explained that the schools in Wilmette were ranked significantly higher and were "clearly going to help [G.L.] more academically." She testified that Matthew, who worked as a union plumber, would have significant difficulty finding comparable work and compensation if he were to move to Champaign County. Sarah, who worked for State Farm, could likely find similar employment near Chicago. Gould recommended joint parental responsibility and an equal split of time between Matthew and Sarah. She further recommended that Sarah relocate closer to Matthew's home because it was "absolutely" not in G.L.'s best interests for his parents to live 170 miles apart.

¶ 12        Wasko, the guardian *ad litem*, testified that he had reviewed Gould's independent child-custody report and the supplemental report and he concurred with Gould's recommendations. In August 2015, Wasko became aware that Sarah had moved into a hotel after an order of protection was ordered against her. Sarah had not notified him of the change in address. The court ordered Wasko to meet with G.L. due to the change. G.L. indicated that he was not eating actual meals, but rather snack foods like "candy snacks" and bananas. This caused Wasko concern. Also, Sarah infrequently communicated with him, including failing to notify him when G.L. required ear surgery. Wasko further testified that the three-hour drives between parents were not in G.L.'s best interests and that his enrollment in kindergarten in Philo prevented Matthew's weekday parenting time. He described Matthew's home as a "very nice suburban home" and said that G.L. was proud of his bedroom there. Sarah's

counsel denied Wasko's request to visit her home. G.L. has a strong relationship with both parents, and neither parent mistreated the child. Wasko recommended that Sarah return to Cook County and that G.L. be placed in the Wilmette school system. He created a full report that was admitted into evidence, but it is not in the record on appeal.

¶ 13        Joseph Strong, a representative of Matthew's union, testified that plumbers in the union in Cook County make $48.25 per hour, with a benefit package equivalent to about $76 per hour. Union plumbers in Champaign County make $41.06 per hour. An individual could transfer from the Cook County area union into the Champaign County union, but the new union's members would get preference over the transferring member. The transferring member could also lose his or her pension and any welfare benefits.

¶ 14        Janet Ambrosini, Matthew's mother, testified that she had previously flown from her home in California to Chicago for a week most months to help Matthew take care of G.L. She has a very good relationship with G.L., as does Matthew. Susan Dutca, Matthew's girlfriend, testified that Matthew has an "extremely close" relationship with his son and that G.L. is his "top priority." She described Matthew's Wilmette home as "very clean" and explained that Matthew cooks for G.L. Neither Matthew nor Susan ever spoke negatively of Sarah to G.L.

¶ 15        Caren Chiuccariello, Sarah's mother,[2] testified that during the first year following G.L.'s birth, Sarah primarily took care of the child and the couple's home. Chiuccariello indicated that Sarah was a patient and "awesome" parent. She also once saw Matthew put "his chest *** up to [Sarah] and he pushed her" during an argument. She opined that Sarah's move to

_____

[2]In her testimony, Chiuccariello identified herself only has Sarah's "relative." However, it is clear from discussion in the record and the parties' briefs on appeal that the witness was Sarah's mother.

Champaign County has been positive for her. She described Sarah's home, her "safe" neighborhood, and G.L.'s success in kindergarten.

¶ 16    On November 28, 2016, the trial court issued a written judgment allocating the parental decision making and parenting time between Matthew and Sarah. The court granted Matthew authority over educational matters, extracurricular activities, and medical matters. Sarah was granted authority for religious decisions. Each parent would hold authority in daily decisions for those days on which they had parenting time. The judgment ordered Sarah to return to the Chicago area and reside within 25 miles of either Matthew's current home or the apartment originally shared by the parents. Matthew was designated the residential parent, and Sarah was granted parenting time every other weekend. Sarah may only exercise her parenting time if it is taken within a one-hour drive of Matthew's home unless the visitation is for longer than 72 hours, in which case it may take place in Sarah's Champaign County home. Both parties were granted three weeks of extended parenting time each year.

¶ 17    The order contained extensive factual findings. The court explicitly explained its consideration of each of the 15 statutory factors set forth in section 609.5(c) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/609.5(c) (West Supp. 2015)), which lists the factors to consider in determining the allocation of parental decision making. This included the court's finding that G.L. was well bonded to both parents, that Sarah was unwilling to cooperate with Matthew and the trial court, and that the distance between the parents was not in G.L.'s best interests. The court also found that Sarah made "the bulk of the day to day decisions" for G.L. due to her having unilaterally moved G.L. away from Matthew and thus this fact could not be held against him. The court also indicated

multiple times that there was no petition to relocate before it and therefore it would not address the issue of relocation.

¶ 18        Following the judgment, Sarah filed an initial notice of appeal on November 30, 2016. She subsequently filed a motion to stay the order pending appeal on December 7, 2016, arguing for the first time that her counterpetition had put forth a sufficient request for relocation. She filed an amended notice of appeal on January 5, 2017.

¶ 19                                    II. ANALYSIS

¶ 20                              A. Sufficiency of the Record

¶ 21        Before addressing the merits of Sarah's claims, we must first consider the sufficiency of the record on appeal. Matthew argues that Sarah has failed to present a sufficient record on appeal. He asserts that Gould's child-custody reports, the guardian *ad litem*'s report, and all of his admitted exhibits have been omitted from the record. He argues, citing *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984), that Sarah has failed to meet her burden as appellant and that we must resolve any doubt arising from the incomplete record against her.

¶ 22        Sarah responds that any inadequacy in the record is due to Matthew's failure to file the admitted exhibits with the trial court. She argues, citing *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Ry. Co.*, 195 Ill. 2d 356, 365 (2001), that the proponent of evidence has the duty to file documents with the trial court and thus Matthew is at fault. Having reviewed all the evidence in the record, particularly the detailed testimony of both Gould and Wasko, we find that the record is sufficiently complete to allow our consideration of the issues raised by Sarah. Although the exhibits in question, particularly the reports from Gould and Wasko, would be helpful in our review, their absence is not determinative because any doubts that do arise from the record would not change our disposition.

¶ 23                                B. Standard of Review

¶ 24        Determining custody is a matter within the sound discretion of the trial court. *Department of Public Aid ex rel. Davis v. Brewer*, 183 Ill. 2d 540, 557 (1998). Accordingly, we apply a deferential standard of review. *In re Marriage of Wendy L.D*, 2017 IL App (1st) 160098, ¶ 76. The trial court is in the best position to judge the credibility of the witnesses and determine the best interests of the child. *In re Marriage of Sussenbach*, 108 Ill. 2d 489, 499 (1985). Where the evidence permits multiple inferences, we will accept those inferences that support the trial court's order. *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004). An appellate court "will not reverse a trial court's custody determination unless it (1) is against the manifest weight of the evidence, (2) is manifestly unjust, or (3) results from a clear abuse of discretion." *In re B.B.*, 2011 IL App (4th) 110521, ¶ 32. Under the manifest weight standard, an appellate court will affirm the trial court's ruling if there is any basis in the record to support the trial court's findings. *In re Marriage of Ricketts*, 329 Ill. App. 3d 173, 177 (2002).

¶ 25        We note that effective January 1, 2016, the terms "allocation of parental responsibilities: decision making" and "allocation of parental responsibilities: parenting time" have replaced the phrase "custody" throughout the Act. See Pub. Act  99-90, §§ 5-15 (eff. Jan. 1, 2016). Neither party suggests that the standards applicable to reviewing custody decisions have been altered by the change in nomenclature.

¶ 26                            C. Factors Regarding Relocation

¶ 27        Sarah first contends that her counterpetition adequately requested to relocate with G.L. and the trial court therefore erred in failing to consider the statutory factors in section 609.2(g) of the Marriage Act (750 ILCS 5/609.2(g) (West Supp. 2015)). Matthew responds

that Sarah never filed a petition for relocation, did not properly give him notice of the relocation, and characterizes her counterpetition for allocation of parental responsibilities as a relocation request for the first time on appeal. He argues that she has therefore forfeited the issue.

¶ 28     It is well settled that a party cannot raise an issue for the first time on appeal, and any issue not raised before the trial court is deemed waived. *Mortgage Electronic Registration Systems, Inc. v. Thompson*, 368 Ill. App. 3d 1035, 1039 (2006). Here, not only did Sarah not characterize her counterpetition as a request for relocation prior to the evidentiary hearing, she explicitly testified that she had never filed a petition to relocate. She first attempted to argue that her counterpetition was a request for relocation in her motion to stay the trial court's judgment pending appeal, which was filed after her initial notice of appeal. Sarah may not change her arguments before the trial court after appellate review has begun. See *Daniels v. Anderson*, 162 Ill. 2d 47, 59 (1994).

¶ 29     Furthermore, even if this court were to overlook Sarah's waiver, her characterization of her counterpetition as a request for relocation is unpersuasive. She relies on two statements in her counterpetition: (1) "[S]ince G.L.'s birth, Sarah has had the primary parental responsibilities over the minor child, and the child has been continuously located in Champaign County, Illinois" and (2) "[I]t is in the best interest of the minor child for the court to enter an Order granting to Sarah the majority of parenting time and allowing Sarah's residence to be designated as the child's primary residence for the purpose of enrollment in Champaign County Schools." Section 609.2 sets forth the steps a parent must take before relocating a child. 750 ILCS 5/609.2 (West Supp. 2015). The parent must first provide written notice of the intent to relocate to the other parent and file that notice with the court.

750 ILCS 5/609.2(c) (West Supp. 2015). If the other parent objects, the relocating parent "must file a petition seeking permission to relocate." 750 ILCS 5/609.2(f) (West Supp. 2015). Sarah unilaterally relocated G.L. after Matthew began proceedings in Cook County without giving written notice and without petitioning the court. The two sentences in her counterpetition, neither of which even expressly requests that the trial court grant *post hoc* permission for the relocation, are wholly inadequate to constitute a petition as contemplated by section 609.2.

¶ 30                    D. Restriction of Sarah's Parenting Time Based on Her Relocation

¶ 31        Sarah contends that the trial court erred in restricting her parenting time to locations within an hour of Matthew's residence unless the visitation is more than 72 hours and ordering her to move back to the Chicago area. She argues that the court must find a compelling reason to restrict a parent's residence. Matthew responds that the cases cited by Sarah rely on repealed statutes and that the trial court's finding that the distance was not in G.L.'s best interests was not against the manifest weight of the evidence.

¶ 32        Sarah relies on *In re Marriage of Samardzija*, 365 Ill. App. 3d 702, 710 (2006), for the proposition that a court must presume that a parent is free to relocate around the state, a presumption which may only be overcome by "a more compelling reason than simply avoiding inconvenience to the noncustodial parent." In that case, the appellate court overturned the lower court's order prohibiting the custodial parent from moving the children's residence more than 25 miles away. *Id.* at 709. The appellate court reasoned that "a parent with primary physical custody of the children need not obtain judicial approval before moving to another location within Illinois," although it noted that "consistent with the trial court's broad powers in custody matters, it may condition custody upon the custodian

living within a reasonable distance from the noncustodial parent to facilitate visitation." *Id.* at 709-10. However, *Samardzija* and the cases it relies on considered custody under the now repealed section 609 of the Marriage Act, which required a custodial parent to seek permission only when a child was moved out of state. See 750 ILCS 5/609 (West 2014) (repealed by Pub. Act. 99-90, § 5-20 (eff. Jan. 1, 2016)). Under the current section 609.2, a relocation of a parent requires consent of the other parent or court permission if the move is more than 25 or 50 miles depending on county. 750 ILCS 5/609.2 (West Supp. 2015); see also 750 ILCS 5/600(g) (West Supp. 2015) (defining relocation). Given the new statutory regulations on parental relocation, we find the reasoning of *Samardzija* and its predecessors is no longer instructive.

¶ 33    However, Matthew's contention that the restriction was in G.L.'s best interests is also flawed. The trial court placed a restriction upon Sarah's parenting time, predicating her time on her remaining within a one-hour drive of Matthew's home. Under the current statute, section 602.7 governs the allocation of parenting time. 750 ILCS 5/602.7 (West Supp. 2015). Although the allocation of parenting time itself is determined based upon the best interests of the child standard (750 ILCS 5/602.7(a) (West Supp. 2015)), section 602.7(b) states "the court shall not place any restrictions on parenting time as defined in Section 600 and described in Section 603.10, unless it finds by a preponderance of the evidence that a parent's exercise of parenting time would seriously endanger the child's physical, mental, moral, or emotional health." 750 ILCS 5/602.7(b) (West Supp. 2015). Section 600 defines "Restriction of parenting time" as "any limitation or condition placed on parenting time, including supervision." 750 ILCS 5/600 (i) (West Supp. 2015). Section 603.10 indicates:

"After a hearing, if the court finds by a preponderance of the evidence that a parent engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development, the court shall enter orders as necessary to protect the child." 750 ILCS 5/603.10 (a) (West Supp. 2015).

The section then lists several restrictions the court may impose on parental decision making and parenting time, including "any other constraints or conditions that the court deems necessary to provide for the child's safety or welfare." 750 ILCS 5/603.10(a)(9) (West Supp. 2015).

¶ 34    The trial court ordered that Sarah's "regular parenting time must be conducted within a one-hour drive from Matthew's home." This is clearly a restriction on her parenting time under the broad definition found in section 600. Such a restriction required a finding by a preponderance of the evidence that Sarah's exercise of parenting time would seriously endanger G.L.'s physical, mental, moral, or emotional health. A hearing was held, and the trial court heard evidence regarding G.L.'s mental and emotional health, particularly as it was affected by the distance between his parents. However, there is no indication in the record that the trial court ever made the necessary factual finding, whether explicitly or implicitly. The court's findings were all made in terms of the "best interests" of G.L. It did not state that it found any "serious endangerment" to the child. Moreover, in its findings regarding decision making, the court explicitly stated that section 603.10 "does not apply." After reviewing the court's order, we cannot find that it made the necessary findings to support its restrictions on Sarah's parenting time and its order that she must relocate.

¶ 35    The trial court is in the best position to make the factual determinations involved in custody matters. See *Sussenbach*, 108 Ill. 2d at 499. Accordingly, we vacate the trial court's

- 14 -

order, in so far as it restricts Sarah's parenting time, and remand for the court's factual determination of whether Sarah's exercise of parenting time further than one hour from Matthew's home would seriously endanger G.L.'s physical, mental, moral, or emotional health. We make no determination on the sufficiency of the evidence already presented to the court.

¶ 36                    E. Testimony Regarding Education Opportunities

¶ 37        Sarah contends that the trial court erred in allowing testimony regarding G.L.'s educational opportunities in Wilmette. She argues that Gould's testimony regarding education was speculative and irrelevant to the court's best interest determinations.

¶ 38        Courts may consider any relevant factors in determining the best interests of a child when allocating decision making and parenting time. 750 ILCS 5/602.5(c)(15), 602.7(b)(17) (West Supp. 2015). Courts have previously found school quality to be a relevant factor in determining a child's best interests. See *In re Marriage of Smith*, 2013 IL App (5th) 130349, ¶ 10; see also *In re Marriage of Taylor*, 251 Ill. App. 3d 58, 61 (1993).

¶ 39        Sarah solely relies on *In re Marriage of Arcaute*, 261 Ill. App. 3d 263 (1994), to support her contention that educational opportunities were irrelevant. In *Arcaute*, the trial court barred the father from presenting evidence regarding the quality of schools where he lived during a custody hearing regarding a three-year-old child. *Id.* at 270. The appellate court agreed with the lower court's finding that the information was irrelevant given the pre-school age of the child. *Id.* In the present case, G.L. was not only of school age at the time of the court's decision, he was actually enrolled in school. Clearly, *Arcaute* is inapposite, and school quality was a relevant factor for the court to consider.

¶ 40                         F. Allocation of Parenting Time

¶ 41 Sarah additionally contends that the trial court failed to consider the statutory factors listed in section 602.7(b) when allocating parenting time between the parties. She asserts that there is no evidence the trial court considered and properly weighed the required factors. Specifically, she argues that two factors in particular weigh in favor of her receiving the majority of parenting time. She asserts she spent the majority of the time providing caretaking functions before the filing of Matthew's petition and that G.L. had adjusted to her Champaign County home, the school, and the community. Matthew responds that the trial court is presumed to have properly considered all factors and that its determination is not against the manifest weight of the evidence.

¶ 42 Section 602.7 of the Act requires courts to allocate parenting time in accordance with the best interests of the child. 750 ILCS 5/602.7(a) (West Supp. 2015). The statute further requires trial courts to evaluate 17 separate factors to determine the child's best interests, including the child's needs, "the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities," the child's adjustment to home and school, and the child's physical and mental health. 750 ILCS 5/602.7(b) (West Supp. 2015). The list of factors is not exclusive, and the court may also consider any factor it finds to be relevant. 750 ILCS 5/602.7(b)(17) (West Supp. 2015).

¶ 43 Although a trial court must consider all relevant factors when determining the best interests of a child, it is not required to make an explicit finding or reference to each factor. *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991); see also *In re N.T.*, 2015 IL App (1st) 142391, ¶ 28. Generally, we presume that a trial court knows the law and follows it accordingly. *In re Alexander R.*, 377 Ill. App. 3d 553, 556 (2007).

¶ 44    Sarah points to nothing in the record that affirmatively shows the trial court did not consider the statutory factors. Instead she relies on the lack of any explicit mention of the factors by the court. This assertion is insufficient to overcome the presumption that the trial court knew and followed the law. The trial court summarized the evidence presented at length, including the evidence relevant to section 602.7(b). The court explicitly set forth findings regarding the factors to be considered in allocating parental decision making under section 602.5(c), which sets forth factors substantially similar to those in section 602.7(b). See 750 ILCS 5/602.5(c) (West Supp. 2015). Ten factors in the subsections are identical. Compare 750 ILCS 5/602.7(b)(1), (2), (7), (8), (9), (11), (13), (14), (15), (17) (West Supp. 2015), with 750 ILCS 5/602.5(c)(1), (3), (7), (8), (9), (11), (12), (13), (14), (15) (West Supp. 2015). For those factors not explicitly considered in the court's discussion of section 602.5(c), it is clear from the record that the trial court considered ample evidence relevant to those factors. Accordingly, we will presume the trial court properly considered all statutory factors.

¶ 45    Sarah specifically argues that the trial court did not appropriately consider "the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities." See 750 ILCS 5/602.7(b)(3) (West Supp. 2015). She asserts that the trial court should have awarded her more parenting time because she and her mother testified that she took care of G.L. for the majority of the time prior to Matthew's petition for allocation of parental responsibilities. This testimony was contradicted by Matthew's testimony that he shared much of the caretaking responsibilities. The trial court is in the best position to judge the

credibility of the witnesses, and we will not supplant those credibility determinations on appeal. See S*ussenbach*, 108 Ill. 2d at 499.

¶ 46    Sarah additionally asserts the trial court did not properly weigh G.L.'s "adjustment to his or her home, school, and community." See 750 ILCS 5/602.7(b)(6) (West Supp. 2015). Stability and continuity are in the best interests of a child, and there is typically a presumption in favor of the present custodial parent. *In re Marriage of Lonvick*, 2013 IL App (2d) 120865, ¶ 33. Yet that presumption does not control every situation. *Id.* Here, there was evidence that G.L. had adjusted to his home and community in Champaign County, making friends and attending school. However, there was also testimony from Matthew, his girlfriend, and the guardian *ad litem* that Matthew also provided a good home to G.L. The guardian *ad litem* indicated that G.L. was proud of his bedroom in the home. Moreover, the child's adjustment is not determinative. Matthew's testimony also provided evidence of Sarah's lack of ability to cooperate and her unwillingness to encourage a close relationship between Matthew and G.L. This is particularly clear in his testimony regarding her failure to inform him of important events and her repeated, unilateral decisions involving major facets G.L.'s life. Having reviewed the entirety of the record, we cannot find that the trial court acted against the manifest weight of the evidence in awarding the majority of parenting time to Matthew.

¶ 47                    G. Other Factual Findings by the Trial Court

¶ 48    The final section included in Sarah's brief is disorganized and incohesive. See *Walters v. Rodriguez*, 2011 IL App (1st) 103488, ¶ 5 (this court "is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented"). Although the section is titled "The trial court erred in allocating the decision making

authority to Matthew pursuant to section 602.5, as that allocation is not in the child's best interest," the contentions that follow do not mention the court's allocation of parental decision making. As such, that issue is forfeited on review. See *id.* ¶ 6.

¶ 49 Instead of addressing the issue named in its heading, the section reiterates Sarah's arguments regarding the allocation of parenting time between the parents. As we have already discussed, we find that the trial court's allocation of parenting time was not against the manifest weight of the evidence. Sarah primarily argues in the final section that the trial court erred in finding that she had "challenged every motion and has caused significant delays in these proceedings by not following court orders for home studies, evaluations, and other court-ordered services." She asserts that this finding is contradicted by the record because she was only sanctioned by the court once for failing to pay Gould's evaluation fee within the proper time frame. She contends that even if the trial court's factual finding is correct, the court may not consider a parent's conduct that does not affect the relationship with the child.

¶ 50 A thorough review of both the common-law record and testimony of the parties indicates that Sarah failed to attend a court-ordered parenting class titled Focus on Children. She objected to Matthew's motion for home study and only signed necessary releases, paid necessary fees, provided discovery materials, and complied with other requests after Matthew filed motions to compel and show cause. Although she was only sanctioned once, there is evidence in the record that suggests her actions have caused delay to proceedings irrespective of whether those actions were ultimately sanctioned. Therefore, the trial court's finding was not against the manifest weight of the evidence.

¶ 51    Furthermore, it is true that the trial court may not consider conduct of a parent that does not affect that parent's relationship to the child in allocating parental decision making or parenting time. 750 ILCS 5/602.5(e), 602.7(c) (West Supp. 2015). However, the trial court must consider a parent's ability to cooperate with the other parent, to facilitate a close relationship with the other parent, and to place the needs of the child ahead of his or her own needs. 750 ILCS 5/602.5(c)(6), (11), 602.7(b)(9), (12), (13) (West Supp. 2015). It is clear from the context of the trial court's statements and the entirety of its findings that it did not consider Sarah's behavior in a punitive context, but rather as an indication of her willingness and ability to work with Matthew and encourage his relationship with G.L. Accordingly, we find the trial court did not improperly consider Sarah's conduct.

¶ 52                                    III. CONCLUSION

¶ 53    For the foregoing reasons we find that the trial court's allocations of parental responsibilities were not against the manifest weight of the evidence. However, we find that the trial court did not make a necessary finding that Sarah's exercise of parenting time more than a one-hour drive from Matthew's house would seriously endanger G.L.'s physical, mental, moral, or emotional health. We therefore vacate the portion of the order placing a restriction on Sarah's parenting time, and remand for the trial court to make the necessary determination under section 602.7(b) of the Marriage Act. 750 ILCS 5/602.7(b) (West Supp. 2015). Accordingly, the judgment of the circuit court of Cook County is affirmed in part and vacated in part, and the case is remanded for further proceedings.

¶ 54    Affirmed in part and vacated in part; remanded with directions.